We call the matter Dijon v. Temple University, et al. Mr. Tucker, good morning, ma'am, please. The first issue that must be tackled here is what I have dubbed the big fiction. The big fiction deals with the mootness issue. Before you get to that, I'd like to explore the issue of appellate jurisdiction and begin that by asking why, oh why, after notice from our clerk's office suggesting that there might be some difficulties here, there was not a follow-up or an additional notice of appeal filed after the entry of final judgment on April 26th. Because we contacted the clerk's office and in our brief deal with jurisdictional issues, we thought we tackled that issue of the appeal, that the appeal in joining Temple University from re-implementing its policy, its former sexual harassment policy, we took the position that there was a final appealable order. Well, it's clear that you filed a notice of appeal to the order which granted injunctive relief and so I have no problem with that. But there was more to this case from day one than injunctive relief. There were prayers, plural, for monetary damages and punitive damages. Ultimately, all there was was an entry of nominal damages by the district court. But I understand your brief to be appealing and arguing that, in fact, your statement of issues attacks the award to plant of a dollar in nominal damages. How is that question before us? How do we have jurisdiction over anything other than the entry of the injunctive relief? Because that was nothing more than a mechanical issue as discussed in the brief. How is it mechanical? The prayers for relief ask for monetary and punitive damages. Those were issues in the case until there was actually an entry of judgment which, at that point, was only as to nominal damages. But nobody knew that and the plaintiff continued to seek more than nominal damages. Did he not? No, he did not. And that was a technical entry entered by the court after it granted a motion to dismiss plaintiff's case at the close of plaintiff's case. At what point and how did he modify his original claim for relief under the complaint? He didn't modify, but there were no damages put forth. The dollar nominal damages was a piggyback onto the original order, which is the point the court entered summary judgment plan in favor of counts seven and eight, the nominal damages was four counts, seven and eight. There were no offers of damages at the trial. That's the March 21 order. Yes. It grants summary judgment on counts seven and eight. But final judgment doesn't come along until April 26th and that's after trial on counts seven and eight, is it not? No, there was no trial on counts seven and eight, seven and eight summary judgment was entered and played his favor. The nominal damages of a dollar was entered on count seven and eight from the court's March 21st, 2007 order. If you look at the record at page 11, that's the final judgment. Yes. It says that counts seven and eight judgments entered again in the amount of a dollar and there was no trial on counts seven and eight, seven and eight was simply the judgment that the court entered when it entered the March 21st, 2007 order. The court merely reaffirmed in its final order, which is dated April 26th, its order of March 21st, 2007. All right, so whether there was trial or not that took place, there is no notice of appeal filed from the entry of final judgment here. So given that fact, what rule or what jurisprudence should suggest to us that we should hear your appeal from the entry of damages here? Because the entry of damages I submit to the court was a piggyback onto the March 21st. I understand that's how you characterize it, but I want to know what rule from either the rules of appellate procedure or from any case law that would suggest that your earlier notice of appeal can somehow spring ahead and incorporate this entry of final judgment. As notice, I rest in what I say on the jurisdictional issue, Your Honor, and that is that where the, there's nothing left but a mechanical function. Since it is only mechanical, since it's only nominal, why do you care about the $1 nominal damages award and raise it in your brief? Because the $1 award was based upon the incorrect March 21st, 2007 grant of summary judgment. It was the grant of summary judgment on the counts dealing with the sentence. It was the grant of summary judgment. If that's all that is of interest to you, that is the summary judgment, which is based on the, on the policy and the determination that the policy was not constitutional. In effect, if that's what the court would like to hear, I, I, I believe that the March 26, 07 order though, reaffirmed the, did nothing except for add damage to the 321, 07 order. And, Your Honor, well, I, I don't want to, I don't want to take up a lot of time then because even if, even if we did not have appellate jurisdiction over the later order, the final, the final judgment here, we've still got to reach the questions of the preliminary injunction and the summary judgment, which implicate your arguments of mootness and ultimately the constitutionality of the policy if we get to that. Exactly. And I believe that the court need address no other issue other than the mootness issue. It is undisputed as the record shows at 213, page 99, 4-7, Plaintiff's deposition as well as the record at 101, page 8, that Plaintiff was enrolled in a three-year master's of history program. And he had three years with which to graduate and counting leave of time that he took because of army sabbaticals, his grad, the last date that he was registered at the university was May 2006. It was in February 2006 while he was still a student that he started suing. Temple's former sexual harassment policy was passed subsequent to his enrollment at Temple University. And it is no question that there is a class, a master's thesis class, which is found on Temple's website, temple.edu, history, graduate, graduate courses. A course for students who are working on their master's thesis and that was a class that Plaintiff was enrolled in, in May of 06. He did not subsequently ever enroll in Temple University and he could not ever enroll in Temple University. Therefore, when the court... But where is all that in the record? I understood your argument to be that he is no longer a student, but I've been left with a question that is still unanswered in my mind as to what a student is, first of all, by Temple's definition, and then even if he were considered not to be a student under Temple's definition, if that resolves the issue entirely. Because as I understand this record, Mr. Dijon is still someone who has a thesis out there that has not been somehow ruled upon by his readers such that we know from this record that he still has a chance of having a master's degree conferred upon him or that he has no chance of having a master's degree conferred upon him. You're wrong, your honor. Mr. Dijon does not have a thesis out there anywhere. You just cannot submit a thesis and then not enroll in school. You have to be enrolled in at least a one-credit course, a master's thesis course, that is that what Mr. Dijon formally was enrolled in, and Temple's program in the record does show this. You have a time with which to complete your master's thesis. He has not been dealing in the past with a reader and a second reader of his thesis and in fact even having conversations or negotiations, if you will, with them about what more has been expected of him? Not since May 2006. But has he been told that we will not discuss this further with you, this is absolutely rejected? Correct. Where can we find that in the record? I'm sorry, it's in the excerpts in his deposition as well as the excerpts dealing with the stipulated facts. Okay, where? That he submitted a thesis that he concedes that the final thesis he submitted was not approved and that was in the semester of May of 06 and his deposition transcript shows that. So you provide us, if you can't do it right now, with the exact citation to the record because I haven't seen that. Are you saying the fact that it wasn't approved means that that's final and it will never be approved? There seems to me to be a big difference between we don't want to hear from you anymore, you're discharged from school. One of the things I was looking for was I thought under Temple's policies there would have been some indication that he was discharged as a student either by graduation or some other form of discharge. It's automatic provision, it's not argued in this case that Mr. Dijon had more than three years to complete his master's thesis, that is not disputed, counting his leave of absence that he took to serve his time in the army, his three years expired in May of 06 and there's no dispute about that. When did he submit the thesis? He started submitting the thesis in 2005, it was highly- And he claims that in 2005 he wasn't getting a fair shake. He claims that the manner in which his thesis was evaluated violated his First Amendment rights in 2005. Are you suggesting that if in fact that's true and they were violating his rights in 2005, as long as the university just sat on its hands through May of 2006 and ran out of time, that there's no problem that the case could become moved that way? The problem with that argument is that very issue was decided at trial and at trial that issue that he said that we retaliated against him or that we acted somehow inappropriately did not make it past the motion to dismiss. So his whole bogus argument that there was some type of conspiracy against him because he was a serviceman or because he said something fell by the wayside and did not pass the muster of the motion to dismiss. We're talking about mootness right now and it's your obligation here to demonstrate to us why this is moot. And I for one have not seen in the record any indication that there is no kind of relationship of any kind between Mr. DeJohn and Temple University such that there is no prospect of his A, having his thesis somehow approved or disapproved and B, if approved, the conferral of a master's degree on it. I would like to see that because it has eluded me up to this point if it's here. My time is up. No, no, no, no. We've got lots of questions. And if I may bootstrap upon Judge Smith's question, didn't you admit that he's a student? He is a former student. In his complaint, he alleged he's an adult graduate student pursuing a master's degree in military and American history at the university. That's page 28 of the appendix. Your answer, filed September 21. Admit it. At that point, we did not know at the last time when he filed the complaint in February of 06, he was a student at Temple University. At that point, we followed the answer to the complaint. We had no understanding that he had not registered at that point. Was there ever any sort of curative filing made? I mean, that's an admission. You're admitting in a pleading that he's a student. He's a graduate student. There is the stipulated facts that the last time that Mr. Dijon was enrolled at Temple University was for the May 06 semester. He has never been enrolled at Temple University since May of 06. Enrolled in coursework. You have to be enrolled in a course to have your thesis reviewed. The university, you have to be enrolled in at least one course. But he's finished. He's finished. He's finished his coursework. Yes, but then you must be enrolled in a course master's thesis. So he couldn't come back next week and ask his readers to take another look at his thesis? His work, his coursework is completed. He could not resume discussions with them about completing the work on his thesis? That is correct. He would have to be enrolled in a class, a one-credit class master's thesis in order to have his thesis reviewed. Okay, so could he come and say, I want to enroll in that one-credit class to get my thesis reviewed? No, because the time period for him to obtain, you cannot just hold out forever the time period for your master, to obtain your master's thesis. There is no dispute by plaintiff, and they will not stand up here and dispute that there is an absolute time period that you must complete your master's thesis by. And knowing that his time period was ending in May of 06, he started in February of 06 saying that there was some type of discrimination or retaliation, which was clearly decided by the district court. There was not. His argument rests on the premise that the reason he didn't complete the master's thesis is because his constitutional rights were violated. But he was wrong, and the district court found that he was wrong. There was no, there was no, he does not say, if you're talking about count seven and eight, Temple University's sexual harassment, former sexual harassment policy, he does not say that that impaired his ability from writing his master's thesis or giving an appropriate master's thesis. He said that the reason why he didn't do an appropriate master's thesis was because of animosity or discrimination by Drs. Emmerman and Irwin. He only said that Temple's former sexual harassment policy was never applied against Mr. Dijon. But isn't he making a facial attack as well as a blood? Yes, he's making an overbroad attack, which is Supreme Court. Well, he's making a facial attack. Yes. Yes. And the Supreme Court, in the various cases that it's looked at dealing with student sexual harassment or conduct codes as our sexual harassment policy has never struck down a school code of overbreadth standard. But is that why you're saying his facial attack is moot? No. That's going to the merits. No. I thought you were going to the merits. I apologize, Your Honor. The mootness argument still stands, and that stands because in May of 06, that was his last semester, it was never applied to him while he was there. All right. But it cannot be later applied to him because he can never enroll in the university again because he has finished his period as a master's student. Well, there are actually two prongs to the mootness argument, and let's assume that solely for argument purposes here that we don't agree with Temple's position that there is and can be no further relationship between it and Mr. DeJohn, be it as a student or otherwise, which means then you must demonstrate to us otherwise to carry the day on your mootness position that the district court was wrong here in its determination that there is nothing to prevent Temple from restoring the policy, right? Correct. All right. And that has been your position, and we have within this circuit some jurisprudence on that, that is, on the issue of non-recurrence, and the burden is on you to demonstrate that, and it's a pretty heavy burden in U.S. v. Government of the Virgin Islands, which you don't cite but which Mr. DeJohn does. Judge Becker wrote that, as the United States points out, voluntary cessation does not automatically render the case moot, and then he goes on to talk about the standard. The standard for determining whether a case has been mooted by the defendant's voluntary conduct is stringent. A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. Now, that's language that Judge Becker quotes from the Supreme Court, U.S. v. Concentrated Crossfade. That sounds to me, in my view of characterizing it, almost like a presumption, the functional equivalent of a presumption, and a damn strong presumption, too. What have you done to overcome that standard, as Judge Becker characterized it? Let me first begin by saying that courts have also recognized that a student's graduation from a school or a student's leaving a school generally moots a claim without the showing of the heavy burden that Judge Becker has discussed in the Virgin Islands case. I do acknowledge that that is good law, but I also acknowledge that there is another avenue also which courts have discussed dealing with ... There's not another avenue in terms of what your burden is. There may be other facts, factual situations in other cases, but that's your burden. That's what the courts have talked about. They have not gotten to Judge Becker's Virgin Islands, but I will get to it because I do want to answer your questions. Why was the district court wrong here? Why was Judge Delisle incorrect in the provision of his February 1st, 2007 order? There is now nothing to prevent Temple from restoring the policy to its previous wording. I think what Judge Becker is talking about in that case, though, does not relate to what the courts have said about school cases, but the heavy burden that has been shown by Temple University took a very contemplative in passing the initial sexual harassment policy. There's no evidence in the record that Temple University willy-nilly changes its policy back and forth. Temple University changed its policy to its modified and apparently current position only in the course of litigation and then when they were staring down the barrel of an imminent summary judgment proceeding, right? This court, as well as the Supreme Court, has said that one cannot begin to question the motives as to why a policy has changed during the midst of a litigation. I'll agree with that factual statement. Let me begin with that. I'll agree with that factual statement, but this court, as well as the Supreme Court, has said that you cannot begin to look into the motives of an entity changing its policies pending litigation because you then get into a whole second tier of litigation. Well, assuming even that we're not looking at motives and only looking at the prospects of the future, why should this court, Mr. Tucker, not be concerned as Judge Dalzell was with the prospect of recurrence when you or Temple University does not even appear to take this court's Sachs decision as one that ought to bind us or at least as applicable to this case? The attack on Sachs, which remains very good law in this circuit, includes a characterization at page 56 of your brief. Because Sachs did not have the foresight to appreciate that Tinker was not the only basis upon which a school could regulate conduct, Sachs' analysis is of limited use. That certainly suggests to me that there might be a prospect here that Temple would think Sachs has nothing to say to the old policy or the new policy. And so with this very stringent test, this virtual presumption as I've characterized it, why shouldn't we just assume Temple could go back? Because subsequent to Sachs and what Temple does take the position is Siponowski also limited Sachs. I understand now Justice Alito's opinion Sachs is good law in this circuit, but Siponowski is equally good law. And if we want to get to the distinguishment between Temple's policy, Sachs, and Siponowski, I'm ready to do that also. Because that deals with the whole Tinker analysis and whether or not Tinker applies here and which of the many standards that Tinker laid out in its opinion applies in this particular case. What you just said, Mr. Tucker, may very well be a strong argument, but doesn't that undermine your mootness argument? Because as I understand Judge Smith's question, the problem you have here is that you're continuing to challenge the margins here. And the case law indicates that when someone is continuing to assert challenges and you rely heavily on Morse, the last term Supreme Court decision, that's indicative of a will to return to the old policy and to scrutinize carefully developments in the law so that you can make that move back to the old policy. I think what it's indicative of is what the courts have recognized that is when schools and universities are drafting policies, they're not penal codes and they don't need to be the exactness of a penal code. And this court, the Supreme Court for years have given great deference to schools and universities and drafting policies. And what you see in Temple's policy and what you see in its position about its former policy is a constant evolution of keeping up with the case law and understanding, as Tinker said, the special circumstances of the school. And this court is continuously, and the case law is leeching, where courts defer to these types of issues to colleges and universities on how to give discipline. And I just want to know where we are now in the question. I guess my point is that I agree with what you just said. These matters evolve and new case law comes and we're constantly reevaluating the state of the law. But that seems to me to undermine your argument of mootness because the notion of mootness is that this matter is final, it will not recur, and what you just said about staying on top of developments seems to me to indicate that Temple has a desire to revert back to the old policy at the first opportunity that it may see fit. Quite to the contrary. I apologize. Go ahead. Quite to the contrary. I think what you see in Temple's constant evolution, even when you read George Moore, the general counsel and secretary to the board's deposition, he says that they were keeping up with the law. When the Supreme Court recognized Title VII sexual harassment, when Title IX, these guidelines were taken by the EEOC, what this was was Temple's attempt, as well as Temple's application of Title VII and Title IX sexual harassment. Temple was... And the district court said that was erroneous, it went too far, violated the Constitution. I think what the district court mistakenly did was cherry-picked terms out of Temple's sexual harassment policy, which was there's never been an allegation that has been misapplied. There's never been an allegation that some student has said that their speech has been suppressed. There's never been as applied application. And when looking at this, I think if you look at Mr. Moore's deposition, you see that Temple was interpreting its sexual harassment policy consistent with Title VII and Title IX, to eradicate the dual purpose that it has a dual capacity here, it's both a Title VII employer and a Title IX college, as most colleges and universities are, because Temple employs students as well as students are students at the university. And the court has also said it gives great deference to the drafter's interpretation and application of its policies. And what you see in these special circumstances, and I quote that from Temple University, I mean from the Tinker case, is that there was never a misapplication of Temple's former sexual harassment policy. It is not a speech code. It is a policy designed to eradicate conduct that this court and the Supreme Court has said interferes with a student's right to obtain equal access to education. What Mr. Tucker, in fairness to you, and because we are well beyond the clock and we're going to go far beyond the clock, we want to give you an opportunity to address the merits as well, because if you, for argument purposes here, were not to carry the day on mootness and if, you know, alternatively, even if the injunctive relief were moot and damages and attorney's fees claims remain viable here, we need to get to the question of the merits of the policy itself. So why don't you take some time to address that. May I pour some water just right there? Absolutely. Take all the time you need. I've been sipping a little bit of it myself. I guess this is where I should make a joke like I wasn't prepared to talk about the merits. What distinguishes this policy from other hastily written policies is the knowledge, the specific knowledge of Temple University and the knowledge of the college and university community, that sexual harassment greatly interfered with students' ability to obtain all the opportunities of college university. Taking the lead from Supreme Court precedent, as well as its own specific experiences at Temple University, which for some reason Judge Dozell parsed out some incidents which we still don't know and included other incidents, and he made a comparison between Temple's former policy and Temple's present policy and said some incidents that would have been included in the former policy might not have been included in the present policy. And I don't quite understand that analysis, but what is clear is that this policy was passed under the Tinker analysis in response to Temple University's own experience of education, of sexual harassment, interrupting students' education. We attached Mr. Moore's deposition, we attached the same basis. Let me just interrupt you, I'm sorry, but that all goes to the intent. I mean, can you speak to the language of the policy? It seems exceedingly overbroad. It's incredibly broad. And what are the differences, really, in any material way, between this policy and the policy at State College High School struck down at SACS? If the court recalls that SACS was a civility code, and the court looked at the purpose of SACS, and this is a sexual harassment policy, and this specific language, and I know this is not persuasive to this court, was found acceptable in the case of Require, R-E-Q-U-A, versus Kent School District, which is located at 2007, U.S. DISS Lexus 40920, decided on May 24, 2007, where the exact language that's here in Temple University's policy, which is language crafted from the EEOC guidelines, was found to be acceptable. And what this language, and you keep saying the language is overbroad, but you can't say that in a vacuum. You have to say... I'm saying it with reference to SACS, I agree. You can't say it in a vacuum, but it's just... It seems to me you're on even weaker footing, because SACS seems directly on point, and SACS was a high school case. Doesn't your adversary have a point when they say that the college environment should be even more open to free speech than the high school environment? They're wrong as two left shoes. And this court, as far back as 1970, at Seal versus Penn State University, has talked about Tinker being applicable in college and university settings. And if we go all the way down to Seriano, what Tinker does recognize is, Tinker changes depending upon the environment that it's in. Whether it's second graders handing out candy, or whether it's students videotaping a teacher leaning over and making rabbit ears behind her, or whether it is a college university. Tinker is flexible enough that it applies in each of those situations, but you have to look at each... What Tinker requires, and what this court, and every court that's looked at Tinker, said you must apply on its own specific facts. I believe Siponowski even said that in another situation... Well, Siponowski says that school administrators have more leeway in the type of code they impose than universities do. Right? Yes, but what Siponowski also said was, in a different context, the Siponowski policy may not have been appropriate. But Siponowski says that universities have to be more careful in what they impose than schools do, right? Yes, and Sill v. Penn State University says, these limitations, talking about limitations of conduct, and I'm quoting, these limitations in some instances may be more appropriate on a university campus than in the non-university society because of the selected purpose and Siponowski says, courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. The judiciary must exercise restraint in questioning the wisdom of specific rules for the matter of their application, since such matters are ordinarily the prerogative of school administrators rather than the courts. So you're saying we should ignore Siponowski? No, I'm not saying you should ignore Siponowski. What I'm saying is that the courts should recognize the long line of cases coming from the Supreme Court as well as this court, which leads to… But there's a line of cases that say universities are places where the students must have the opportunity to think, to inquire, and that's why there is a different standard for a code in a university than there is a code in a middle school or a high school. And I'm saying, isn't that what Siponowski says to us? Siponowski says as well as Tinker says that… Siponowski says that although speech codes are disfavored under the First Amendment because of their tendency to silence or interfere with protected speech, public, secondary, and elementary school administrators are granted more leeway than public colleges and universities. I agree that that is an absolute correct statement of the law. Right, right. And so shouldn't we pay attention to that? Yes, and because you do, that's why you look at Temple University's experiences. Because it has to be more careful with its code than high schools and middle schools. I respectfully disagree with that. Well, that's what the language says in the cases. Do we ignore that? That is not what the input of the language is. It certainly is what the input that public, secondary, and elementary school administrators have to be more… can be more strict. We give them more leeway. Yes, but the language also says that in the university setting, courts have also said consistently that in the university setting, we give deference to administrators also, and we do not require them to draft, with the carefulness of a penal code, their conduct policies. You are saying to me then, ignore Sidniewski. I'm saying… Look, we've discussed this enough. I think we need to move on to something else. Can I quickly, though, I want to get this… I think we need to move on to something else. Okay, if you take a look at the case, Norton v. East Tennessee State University, the 6th Circuit. If you take a look at the case, Alabama State Party, out of the 11th Circuit. If you take a look at Jenkins v. Louisiana State, which is Grambling College, out of the 5th Circuit, as well as Bayless v. Maritime, out of the 5th Circuit, dealing with Southwest Texas State University, as well as Widmar, invented by the Supreme Court, and Healy and James, you'll see that every one of those cases has consistently applied Tinker and the Tinker analysis in dealing with codes of conduct. And this, I must be clear, this is not a speech code. This is a sexual harassment policy, and that fact cannot be lost on the court. And to require universities to draft these policies with exacting language, to come up with the various types of problems that may arise in a college university, I believe is to put a burden too heavy on a college and university. They must be left with some leeway because of the numerous situations that may arise in any day, in any classroom, in any classroom setting. And that's why, in this particular case, you have to look at the general meaning of these terms, the general meanings of these terms, as described by the EEOC, which is where Temple University's policies language tracks. Well, as did, to a great extent, the language in Sachs. Yes, I do not disagree. But I think what you have with Temple is a long history of non-suppression of speech by sexual harassment. Some credit must be given to the drafters' application of that policy. And I think what is clear by this is that Temple University has required both the because this language does come from the EEOC guidelines. If you look from the EEOC guidelines, which Temple has construed as policy consistent with and consistent with Title VII and Title IX, the subjective and objective component is there. Well, I think we understand your position. Obviously, we've kept you at the lectern well beyond the red light. The good news all of counsel should always take from that is that it certainly suggests we've carefully read your briefs, we've looked with interest at the record, and we're engaged in the case. And we'll have you back on rebuttal. Just one final note on the Tinker before I come back on rebuttal. I still do not concede that the district court was correct with its only application of Tinker as a substantial material interference. I believe there was still a question of fact, but I believe Tinker laid out, as my brief said, four different bases for an institution to pass a sexual harassment policy. And one of those bases is the interference with the rights of others. And that was one of the bases that the district court failed to look at. And if you look at the interference rights of others, which is specifically recognized in Tinker, unless this court is willing to say that Tinker is not applicable in colleges and universities, which I don't think the court is suggesting, but what Tinker does specifically acknowledge, and what other courts have said, that one of Tinker's bases is the interference with the rights of others. And Judge Hardiman, I believe you talked about how it went on about Morrisey. Morrisey is important. I think we've now gone beyond the one additional point that you wanted to take up, Mr. Tucker. So you'll have rebuttal. Mr. Kittle? Good morning, Your Honor. May it please the Court. My name is Nate Kellum, and I represent the appellee, Christian Dijon. For the exact same reasons this court espoused in Saks versus State College Area School District, the Temple sexual harassment policy, as it read before January 15, 2007, is plainly unconstitutional. Well, you've jumped all the way to the merits. Do you have anything to say that would help me at all with the questions I've raised about appellate jurisdiction over the final order that was entered here? Certainly, Your Honor. We would agree that there is no appellate jurisdiction on the issue of nominal damages. I think that's to be sit down for an injunctive relief. But as far as nominal damages, what I would point out to the court is in the record, page 7, this is the order in which the judge ruled on summary judgment in the March 21, 2007, order. And on page 7 of the record, and it's page 5 of the order, if you would take a look at footnote number 5. Because the question of what, if any, harm Dijon suffered as a result of the unconstitutional policy is a question of fact about which there are serious disputes, it must be held over for trial, which is why I talked about trial when I inquired this of Mr. Tucker. I have read and reread that order, obviously, and the footnote. And for that reason, it wasn't until April 26 that the court entered the final judgment. Literally, the court recognized the bifurcated nature, if you will, of what was happening. Yes, Your Honor. All right. Then it would probably be best to sequentially move to the issues of mootness rather than the merits of the policies, as Mr. Tucker did in his argument. Yes, Your Honor. Dealing with the issue- What was Mr. Dijon, by the way? Was he a student? What is a student for our purposes in this case, by which I mean how did Temple define a student? And finally, even if he wasn't a student by some definition given to us by the university, does he have some other kind of relationship with the university such that this matter, his interest here, would not be moot? Your Honor, whether Mr. Dijon would look at it is he is definitely still a student in the sense that he- Well, I don't want to know how he would look at it. I want to know what the record shows- Sure. Because speaking only for myself, the record was anything but crystal clear on just what Mr. Dijon's status was and what his relationship was vis-à-vis Temple. Yes, Your Honor. What the record demonstrates is that he completed his coursework, but in order to graduate, he still needs to complete a thesis. And that he went through a series of efforts with various professors regarding that thesis. And where it was last left was in March 2006. And this is shown on the record, page 104, particularly if you look at paragraphs 44 and 50. These are stipulated facts. And basically the way it describes it is in March 2006, Mr. Dijon produced his most recent draft. Is this page 104 you're saying? Yes, Your Honor. Number 104. And I'm particularly referring to paragraph number 49. Yes. And it talks about- this is where we- In March 2006, Dijon produced his most recent thesis draft to Andrew Eisenberg, who at the time was the chair of the history department. And then in 50, it says, Dr. Eisenberg forwarded the draft to Dr. Lockenauer for his review as Dijon's primary reader. And this is where we still are. Mr. Dijon is still waiting for- Mr. Tucker says there's no opportunity for Mr. Dijon to come back. He can't come back. Is that in the record anywhere? No, Your Honor, and that would certainly be a surprise to Mr. Dijon. And as to this three-year period, my notes indicate that if that three-year period were truly enforced, his time would have been up in January of 2006. Is that correct? That's right. No question. And it would certainly seem inappropriate for the university to be able to delay that time period and then tell him, well, because of our delay, because the ball was in their court regarding the thesis. So if they had a three-year argument, it's your position that when he submitted in March of 2006, they should have said, well, I ain't even going to consider this because your time expired in January of 2006. Yes, Your Honor. But that's not what happened. That's not what happened at all. In fact, he's received absolutely no response, and he is very much awaiting whether it's acceptable or there's additional criticisms so he can pursue his degree. That's very much what Mr. Dijon wants to do. And so as far as that particular issue, we don't believe that serves as a basis for mootness at all because whether you call him a student or whatever he's classified, still he has a continued interest in obtaining his degree at the university. By that comment, would you agree then that simply saying he doesn't meet a definition of student, if that exists out there somewhere, does not definitely or does not without more carry the day for Temple University? He may have some other relationship short of what they style as a student, but still that relationship is such that he has interests that have not been mooted here. Certainly, because it would apply to anybody within or around the Temple community, which he certainly would be part of. So for that reason, I don't believe Temple's ever carried the day at all in respect of mootness. Now, another issue that Temple brings up is the fact that they have a new posse in January 15, 2007, which does deal with the precise concerns. And it does and it has, and you haven't attacked at any point the new posse. No, Your Honor. You're satisfied, if you will, with the new posse. In fact, it deals directly with the issue specified in Sachs, and that is the purpose prong in which it would allow someone a curved expression as it would relate to the speaker's motivation, that they eradicated that aspect of it. And also the prong dealing with creating an intimidating or hostile or offensive environment without specifying that it would have to be of severity, pervasiveness, and objective offensiveness. And so they've cured those problems, and so there's no challenge to the new posse. And so the question and what they try to raise is because of the new posse, the challenge to the former posse is moot. And I think what the case law shows, and certainly the case that Your Honor referred to, the government of Virgin Islands, indicates that's not the case at all because the burden is theirs, and they have supplied absolutely nothing. I mean, there is nothing in the record indicating that there's not an inclination to revert back to that. If this court was to find the claimant. Well, even if there was something, the burden is what it is, and it's a very, very high burden. It's referred to as stringent. Stringent. And they certainly have not met that here, and as Judge Hartman points out, it is severely undercut in the sense that their defensive posture has consistently been that the former posse is constitutional, that they not only defend the constitutionality of it, they defend, and they go to great lengths in this regard, they defend the need for it. And so I think in light of that defensive posture. What if they had come to this court and said that prior policy was wrong, we made an honest mistake, we were terribly wrong, and we learned our lesson and we're never going back to it? Would that have mooted the case? I think if that was the posture and that was put in the record, yeah, that would have mooted the case because what that would have indicated is that they have moved on. And I think that it would not fall in line with the other cases such as the Seventh Circuit case, the SASMED case, which indicates that you cannot on one hand defend the constitutionality of the policy and then on the other hand say that it's moved because you're not going to revert back to it. Let me just ask one other question on mootness. Can you address Mr. Tucker's argument about this requirement that your client be enrolled in a one-credit class? Your Honor, there is nothing in the record regarding that requirement. As far as Mr. DeJohn knew, he had every opportunity to complete his thesis, and there's nothing in the record indicating otherwise. Without being enrolled? Yes, Your Honor. In dealing with the merits of the case, if that's appropriate for discussion at this point, SACS clearly controls. You take a look at the SACS case and really they only specify two concerns. One was about the purpose prong, and then the other was about having a curving of expression that would create a hostile environment, intimidating environment, or offensive environment without saying that it would require sufficient severity, pervasiveness, or objective offensiveness. And those very same problems are also here with this policy of temples. In following SACS, clearly it would seem to be, and the district court rightly did, rule it unconstitutional in applying the precedent of this court. Now, I would agree that, and of course we argue, that perhaps a less deferential standard would actually be more appropriate. If you take a look at Rosenberger, you take a look at the Widmar v. Vincent case, it would seem like a form analysis where it's more of a content-based restriction. And so really probably what would need to be shown here is that it's nearly drawn to a compelling state interest, which of course they don't even come close to showing here. But we would argue that irrespective of the standard, whether this court turns to SACS or whether it applies a standard that would seem more appropriate for the university level, under either one, this court would be obliged to agree with the lower court that the policy is unconstitutional. And because the policy is unconstitutional, accordingly, Mr. DeJohn is entitled to the relief he sought and a relief that was awarded by the trial court, that being injunctive relief, declaratory relief, declaring the policy to be unconstitutional, and nominal damages. Can we reach nominal damages in light of the appeal before us, or if we affirm the order of March 2007, does that then follow that the award of damages, which was not appealed, would follow? I would agree with that, Judge Roth, that effectively he's able to obtain nominal damages because the April 26 order was never appealed, and it certainly wasn't appealed in a timely fashion. Thank you. Mr. Tucker? Judge Roth, just addressing your point, I agree that if you affirm the district court's grant of summary judgment on counts 7 and 8, you do reach, you of course then don't touch the nominal damages because it's our position that that was a bootstrap onto the motion for summary judgment. But under plaintiff's theory that he was a student, anyone that was once at Temple University who paid tuition at one point in time is forever a student. And I did not attach plaintiff's entire deposition transcript, but it's a part of the motion for summary judgment, and his entire transcript. And in there, in that deposition, and I apologize to the court's law clerks, but in his deposition, plaintiff specifically concedes that the last thesis, and he started giving his thesis in 2005 is when he gave his first unacceptable thesis. It continued on for a year. His last thesis that he submitted to Temple University, he conceded that it was unacceptable, and he was told it was unacceptable. But let me turn quickly to the record of age. Well, unacceptable, however, does not end the discussion. The reality of graduate education is that many people go a long time before they achieve a graduate degree. There are people who remain ABD, all but dissertation, for long periods of time. Perhaps they never complete. Sometimes they do. Often they do. But what that means is there is an oeuvre out there. There is a body of work that has been done, and it may not be complete, but that still bears the potential of being completed, and therefore providing an opportunity for the student to eventually obtain the graduate degree. So, I mean, we want to know what is in the record here that would suggest that there was an absolute bar to Mr. DeJohn such that his draft master's thesis, which we have every reason to believe exists in some form, albeit incomplete and or unacceptable, might not be modified, improved, polished to the point where he can advance it once again and seek from Temple the conferral of the master's. Because it is a three-year program. Even those people who are ABD, they are registered for one class, and a Ph.D. dissertation is different from a master's thesis. And even when you're ABD, you're still registered for a one-credit dissertation class. It's no different than you're registered for a one-credit master's thesis class. Where in the record does it say that? Are you just telling us what the policy is, or is there something in the record? I'm going to read to you what I just have from the record, and we're going to have to exist with what it has. But on Record 101, at paragraph 8, a stipulated fact, all coursework and other requirements must be completed within three years from the date of admission unless a leave of absence has been granted. Now, if you turn to the Record 102, you, Judge Hardiman, you tried to suggest that he had continuously, he was passed a three-year period. Point of fact, he was not. Because if you look at paragraph 22 on the Record 102, Mr. Dijon was called to active duty, and he was given a leave of absence. And that's why he was... But I'm counting the leave of absence when, by my calculation,  That accounts for his leave of absence. He enrolled, though, in January, and he took a total of three semesters off. He took some summer correspondence classes, too. When do you say the three years expired? May of 2006. And if you look at the record at 104, paragraph 51, he concedes Dijon is not currently registered as a student at Temple University and has not been registered since spring semester 2006. If you take a look at the record... That does not, of course, by its terms, preclude re-registration. But, Your Honor, I respectfully disagree. If you look at the record at 213, at paragraph 99 of his deposition, page lines 4 to 7, this is a three-year program, not a four-year program. 213 in the record, and what page of the depot? Page 2, the record 213, lines 4 to 7. There are four depot pages set forth. Yes, page 99. Thank you. Deposition, paragraph 99. Lines 4 to 7. And when you read the record at 213, lines 4 to 7, in conjunction with the record at 101, paragraph 8, all coursework and other requirements must be completed within three years from the date of admission unless a leave of absence has been granted. Under your scenario, respectfully, Judge Smith, a university such as Temple University would expend its resources and time of its professors taken away from other classes reviewing theses of students who are not registered and who are not paid for the benefits of the university. Mr. Tucker, my problem, though, is that I might agree with you. I might concede you carry the day if we were dealing at a different level in a regime where the preponderance of evidence standard applies, but we're not. We're right now addressing this within the context of mootness and discussing it subject to that very stringent standard that exists and which requires you to come forward and demonstrate that it's absolutely clear that there can be no recurrence. We're dealing with something very, very different here. Well, I was dealing with the first part of the whole thing. I'll deal with the second right now. I have it on the student. You do acknowledge that there was a period up to May of 06 when Dajon was a graduate student at Temple University working on a thesis when the... If we affirm the district court, when the unconstitutional policy was in effect. It was in effect, yes. We do not concede that the sexual harassment policy, though... You've answered my question. You can go on to the next... You don't concede it was unconstitutional, but I... You've answered my question, so... Here's what... You have answered my question, so don't worry about it. The point cannot be... I cannot step away from the point, and I know I'm way past my time, without having the court understand that each of these various cases, say, if you look at the whole cases with the Confederate flag cases and the Swastika cases, starting with West V. Durbin, you can't take automatically the policy in one context and say it's automatically constitutional in the other context. Tinker requires that you analyze the prior history of a particular college and university. That's why Sachs does set forth a standard. Sachs says language similar to Temple University. And the other big myth that I did not also tackle is throughout Plaintiff's brief, they keep referring to the Tuttleman Counseling website and language in the Tuttleman Counseling website. Judge Hardiman, when you were talking about the languages way overbroad, I'm concerned that you are adopting what Plaintiffs have shown. And the record, we keep talking about the record, the record clearly shows that the only policy that Temple University has on sexual harassment is its sexual harassment policy and not the Tuttleman Counseling website. But the Tuttleman Counseling website is an official website on the Temple server, right? Yes, and it's not a policy. And Judge, even in reaching his decision, Judge Dozell did not conclude it was a website. Temple has never, ever conceded that the Tuttleman Counseling website is an official policy. As a matter of fact, if you look in the record where you see the Tuttleman Counseling website, and as discussed in the briefs, there is a link here. It says, For Temple University's Policy on Sexual Harassment, click here, link here. They then, Plaintiffs, went into all the language in the Tuttleman Counseling website and gave that to you, Judge Hardiman, in another big fiction, the same big fiction if he's a student. None of the language in the Tuttleman Counseling website is at issue here. The only language that is at issue here is Temple University's former sexual harassment policy, which tracks the language of the EEOC, which I implore this Court, it must look at Temple University's prior experiences. And what, Judge Smith, you're stuck on the fact that Temple University may revert back to its former policy and that the fact that we are not... I'm not stuck on that or any fact that I may have... Tell me the question. I may have unfairly confused you with my erroneous application of the language from the Virgin Islands case that applies only to recurrence, but this is a summary judgment that we're reviewing and, of course, then it's subject to plenary review. So, I mean, we have to look at the entire record in that plenary review. And you've cited us to a number of portions in the record, and we're going to have to pretty much use this inquiry subject to my colleague's possible additional questions to the point where we end the argument. But anything else in the record that would suggest that there can be no exceptions or that somehow this three-year period is a drop-dead period which forever bars Mr. John from coming back and attempting to pursue the degree through a continuation of his relationship with the readers at Temple of his thesis? It is the policy of the program. It is conceded. In academia, schools and universities are permitted to set guidelines, and for one reason or another, Temple University has set the guideline for its Master's in History program to be a three-year program unless a leave of absence has been requested. Mr. DeJohn does not dispute that those were the requirements. So if he tries to enroll in that one credit course for the summer, he can't do that? He cannot enroll because the time period for him to complete the program has expired. Where does it appear in the record, in the form of a categorical statement like that, that a person cannot reapply? The categorical statement comes from Mr. DeJohn that he only has three years to complete the program. That's the only categorical statement. Mr. Tucker, thank you very much again. We've kept you at the podium beyond the red light. It is never a problem. Thank you very much, counsel, for your helpful arguments. In this very interesting case, we will take it under advisement.